[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. It is found that all of the allegations of plaintiff's amended complaint have been proven, that the marriage has broken down irretrievably, and the marriage is ordered dissolved for that reason.
II. THE GROSS MARITAL ASSETS OF THE PARTIES.
PLAINTIFF (wife)
No. 25 Knollwood Road, Farmington, CT.
Total Value $160,000
Less First Mortgage $67,096
Less Home Equity Loan 19,070
 -------
 $86,166 — 86,166
 --------
Total Equity $ 73,834 $ 73,834
Household Furniture
2,000 Bank Accounts 8,589
Savings Bonds (in childrens' names — $1,100) —
Life Insurance (C.S.V.) —
Incentive Savings Plan (I.S.P.) 46,621
Pension 15,000
I.R.A. Burritt Savings Bank 3,085
 --------
 Total $149,129
DEFENDANT (husband)
CT Page 6610-A
Workers' Compensation Claim and
Products Liability Claim pending —
 ---------
 Total
 Total Gross Marital Estate $149,129

III. The Determination of Credits to be Awarded the Parties Prior to the Distribution of the Marital Estate
A. The Purchase of 25 Knollwood Road, Farmington, CT.
On June 30, 1986 plaintiff purchased No. 25 Knollwood Road, Farmington, Connecticut (hereinafter Knollwood) for $131,000, financing the purchase by means of a mortgage of $71,000 and $60,000 in cash received from the sale of her former home in Newington, Connecticut, a pre-marital asset. The balance of the proceeds received by plaintiff from the sale, i.e., $6600, was spent on family vacations and household upkeep. Title to the new home also was in plaintiff's name alone. A bridge loan was necessary to complete the purchase since the sale of plaintiff's former residence post-dated her new acquisition by one month. In any event, defendant made no contribution to the equity obtained from the sale of plaintiff's former home. Knollwood is presently valued at $160,000. The present balance on the first mortgage has been reduced to $67,096. Subsequent to the purchase the parties obtained a home equity loan in the amount of $19,070, $15,000 of which was expended in the construction of a porch and for porch furniture, and $4,000 of which was applied to plaintiff's son's college tuition. On the evidence it is found that plaintiff is entitled to a credit of $56,000 ($60,000 pre-marital asset — $4,000 spent for non-family purposes) when the marital estate is distributed. Plaintiff should receive no credit for the $6,600 expended for ongoing family purposes, this being considered more in the nature of a contribution or gift to the entire family.
B. The Sale of Defendant's Package Store
At the time of the marriage defendant was the owner of real estate in Hartford which included a package store. In 1985 he conveyed this property to the plaintiff because, as plaintiff testified, he was in arrears in support payments CT Page 6610-B for the children of his first marriage and had failed to file his income tax return for 1982. In 1986 the property was sold and although plaintiff had legal title, the defendant received the proceeds of sale, part in cash and part through a purchase money mortgage. Defendant seeks a credit for this pre-marital asset similar to that received by plaintiff. The trail of the proceeds in this transaction, however, is much more difficult to follow, despite the copious notes taken by the court. The following is an account of what it is believed transpired:
At the time of the sale defendant received $48,665, including the deposit. From this amount he paid personal pre-marital debts totalling $12,300, purchased a car for $6,200 and acquired I.R.A.s for plaintiff and himself amounting to $2,000 each. He also claims to have paid a capital gains tax due on the sale amounting to $9,632. At this point it is found that $32,132 of the original payment was expended as above-stated, leaving a balance of $16,533. Plaintiff contends that this balance was spent for family expenses and vacations, toward defendant's medical expenses including $2,500 to his psychiatrist, and in support payments for his children. Defendant provided the court with no detailed explanation of the transaction.
In 1991, in a balloon mortgage payment, defendant received the balance of the proceeds of the sale, i.e., $14,834. From this amount defendant received through court order $6,400, counsel for the parties each received $1,500 and defendant claims to have paid a capital gains tax of $2,115, leaving remaining by defendant's calculation $3,319. Plaintiff in turn argues that there only remains the sum of $1,030 in her I.R.A. at Burritt Savings Bank.
After examining and weighing with considerable difficulty the claims of both parties on this issue, this court concludes that the proceeds from the sale of defendant's real estate cannot be treated in the same fashion as the $60,000 from the sale of plaintiff's pre-marital home, that the latter sum is readily identifiable as having been part of the purchase price for an existing marital asset also and significantly in plaintiff's name alone, while the former was used for various purchases, most of which were personal to defendant and a minimum of which were of benefit to the family. The only part of this transaction which presently CT Page 6610-C remains traceable and identifiable is the $1,032 in plaintiff's I.R.A.
This court holds that defendant has not sustained his burden of proof concerning the bulk of the proceeds received by him in this transaction and that, viewed in their most favorable light, they should be treated exactly as were the balance of plaintiff's funds from the sale of her pre-marital home, i.e., $6,600, which this court excluded from the Credit awarded plaintiff.
This court concludes that in this sale defendant is entitled to a credit of $2,530, representing the balance in plaintiff's I.R.A. account and the amount paid ($1,500) to plaintiff's counsel.
C. Plaintiff's Investment Savings Plan (I.S.P.)
Having taken advantage of an investment savings plan at her place of employment, plaintiff at the time of her marriage to defendant had a balance of $5,444 in that account. When the parties separated on August 5, 1991, there was $32,000 in the plan. At the present time the balance is $46,621.
There is no evidence that defendant in any way contributed to this account either before the marriage or after the separation of the parties. It is, therefore, concluded that the figure $26,556 ($32,000 on hand on date of separation — $5,444 on hand on date of marriage) be utilized as the adjusted value of plaintiff's pension when distributing the marital estate.
D. Plaintiff's Pension
Another benefit which plaintiff has received through her employment is the right to a pension upon her retirement. The pension, which is completely funded by her employer, had a value of $10,933 at the time the parties separated and now has an estimated value of $15,000.
There is no evidence that defendant in any way contributed to the increase in value of this marital asset since the date of separation and its worth at the time of separation, i.e., $10,933, will be the value employed by the CT Page 6610-D court when the estate is distributed.
E. A Recapitulation of the Various Credits
 Plaintiff
Contribution to purchase of Knollwood $60,000
 Defendant
Tuition payment from home equity loan $ 4,000 Sale of package store property 2,530 ------- $ 6,530
Total Credits due Plaintiff $53,470
IV. The Adjusted Gross Marital Estate of the Parties
 Plaintiff
Equity in Knollwood $20,364
($73,834 less $53,470 credit)
 Household Furniture 2,000 Bank Accounts 8,589 Life Insurance (C.S.V.) — I.S.P. 26,556 Pension 10,933 I.R.A. Burritt Savings Bank 3,085 ------ Total $71,527
 Defendant (husband)
Workers' Compensation Claim and — Products Liability Claim Pending
Total Adjusted Gross Marital Estate $71,527
V. The Evaluation of the Evidence in Accordance with the Provisions of Sec. 46b-81 C.G.S.
The plaintiff wife, who is 41 years of age, and the defendant husband, who is 46, were married on November 17, 1984, eight and two-thirds years ago, after having lived together for several months. This was the second marriage for both parties, their first marriage in each case having CT Page 6610-E terminated in divorce. Plaintiff has two adult sons of the first marriage, both of whom will be attending college this autumn and each of whom she assists financially with his education. In the past she received little, if any, child support for her sons from their father. Defendant also has two children of his first marriage, a son and a daughter. He has paid, sometimes with plaintiff's assistance, an average of $160 per week for their support since his divorce.
At the time of their marriage the parties were residing in a dwelling in Newington, Connecticut owned solely by the plaintiff. Defendant then owned real estate which included a tavern located in Hartford. Plaintiff had at that time been employed for five years at Aetna Life Insurance Company while defendant worked at Battiston's, a dry cleaning establishment. In 1986 plaintiff sold her home in Newington and used the bulk of the proceeds to purchase another home in Farmington, Connecticut, title to this property also remaining solely in her name. About this time in 1986 the tavern real estate, which defendant had conveyed to plaintiff the previous year without consideration, was also sold. The intricacies of these transactions have been examined and analyzed in a previous article.
Plaintiff has continued her employment in the accounting department at Aetna. Her current financial affidavit reflects a gross weekly income of $962 and a net after the usual deductions, including $52 toward an investment savings plan, of $477. During the marriage plaintiff always earned more than defendant.
Following the marriage defendant continued his full time employment as a dry cleaner, becoming manager of a branch store in the late 1980s and until 1991 when for health reasons he was forced to cease his employment. He has not worked since the summer of 1991 and has two lawsuits planned as a result of his inactivity. His most recent financial affidavit reveals a weekly income from social security of $225 together with $40 per week alimony pendente lite received from plaintiff.
As a fringe benefit from her employment, plaintiff had her tuition paid at Greater Hartford Community College, which she attended evenings and from which she received an AA CT Page 6610-F degree in accounting. She is presently well on her way to receiving a B.A. degree in accounting at Central Connecticut University. The health affidavit of the parties indicates defendant attended college for two years.
Health
Plaintiff appears to be in good health and no complaints were noted.
Defendant, on the contrary, has had an assortment of ailments over the years, at least one of which pre-dated the marriage to plaintiff. In plaintiff's words, "I didn't know the full extent of his medical problems when I married him, although I knew he was diabetic." Dr. Thomas Jones, a specialist in internal medicine, testified that when he first saw defendant in 1985 he had a twenty-year history of diabetes which was being treated with insulin. At that time defendant had recently undergone a penile implant operation to correct an impotency problem, and he was suffering from high blood pressure. Dr. Jones stated that he had last seen defendant on May 17, 1993, that he had not seen him during the preceding year, that the diabetes had not progressed during the interim, that the prognosis was not totally predictable and that diabetes was incurable. He also noted that defendant still smoked cigarettes and that he had cautioned him about this habit. Defendant testified that diabetes had affected his eyesight and that for that reason he was unable to drive a car. For the past two years he has been attending classes for vocational retraining.
Defendant has a history of substance abuse. In 1981, prior to this marriage, he was admitted to Mount Sinai Hospital for a cocaine problem. He has also during the marriage used marihuana, claiming that it helped his diabetes. Concerning the frequency of its use, he testified "one a month — maybe."
Most recently, in July 1991, defendant was hospitalized for a period of one month for "deep psychological problems" dating from childhood. Previously, commencing in 1986, he had begun seeing psychiatrists and psychologists under plaintiff's health plan.
Finally, defendant stated that his continued exposure CT Page 6610-G to harmful dry cleaning chemicals at his employment have had an adverse effect upon his health and have prevented him from working.
At the trial defendant appeared to be slow in his response to questions, his memory at times was not especially sharp and he did not present himself as one who at this time would be physically able to work.
Fault
Fault, or responsibility for the breakdown of the marriage, can most readily be ascertained from an examination of the testimony of the parties in this issue.
Plaintiff: "I was beginning to see his temper in 1985. I recall his grabbing my son by the neck and putting his fist through a wall. I talked to him and he said it wouldn't happen again. His verbal abuse, addressing me with such names as "bitch" and "whore" became worse over the years. His outbursts of anger also became more frequent as time went on. We were separated in May, 1990 for one week because of his violent temper. Six months before that there was another instance of his uncontrollable temper. I did everything I could to help him. I attended sessions with psychologists — I learned of his problems." Finally, on August 5, 1991, during an argument defendant knocked plaintiff to the floor and choked her, requiring emergency hospital treatment for plaintiff and resulting in defendant's arrest. The parties separated at this time and this action was instituted two months later. Plaintiff's son, Bryan, supported her testimony concerning defendant's physical and verbal abuse.
Defendant: "I don't think we had any problems in he early years of our marriage. I can't remember any big things. I smoked pot but used no other drugs during the marriage. She smoked with me in the beginning, but there came a time when she stopped and I didn't. I thought the relationship with her children was OK. I did use physical force on them but it wasn't a lot of times. In Farmington I kept the house one of the nicest on the street. I gave my paycheck to her. I recall no-marital problems with her from 1989 to 1990. I remember beating on her two or three times during the marriage. It was very minimal — it wasn't every month. CT Page 6610-H Lastly, I have no recollection of the August 5, 1991 episode, although apparently it happened."
After a review of all the evidence, this court finds that fault for the breakdown of the marriage rests with defendant.
Other Factors
Plaintiff contributed more than defendant in the acquisition, preservation or appreciation in value of their marital estate and has a greater opportunity than does he for the future acquisition of capital assets and income. The financial affidavits of the parties reveal that plaintiff's liabilities exceed those of defendant. Her vocational skills and employability are superior to those of defendant.
After carefully considering all the evidence in this matter as it relates to Sec. 46b-81c C.G.S and after giving particular weight to such predominating factors as the length of the marriage, fault, the health of the parties, their financial outlook for the future, their liabilities (most of defendant's debts are covered by plaintiff's health policy) and their relative contributions to the marital estate, it is found that the adjusted gross marital estate of the parties should be divided as follows:
 Plaintiff 60% Defendant 40%
VI. The Distribution of the Adjusted Gross Marital Estate Accordance with the Finding made in Article V, (supra).
 Total Adjusted Gross Marital Estate $71,527 60% interest of plaintiff 42,916 40% interest of defendant 28,611
 Plaintiff's amended sale title to the following:
 No. 25 Knollwood Road, Farmington CT Total Adjusted Equity $20,634 Household Furniture 2,000 Bank Accounts 8,589 CT Page 6610-I Life Insurance (C.S.V.) —
 I.S.P. (Adjusted) 26,556 Pension 10,933 ------ Total $68,442 Less amount due defendant 25,526 ------ Total due plaintiff $42,916
Defendant is awarded sole title to the following:
I.R.A. Burritt Savings Bank $ 3,085 Amount due from plaintiff 25,526 ------ $28,611
Said sum of $25,526 shall be paid by plaintiff to defendant forthwith by means of a qualified domestic relations order relating to plaintiff's Incentive Savings Plan.
Re Defendant's Claims:
Plaintiff shall be entitled to 50% of the net proceeds of any award received by defendant from his pending Workers' Compensation and Products Liability claims.
VII. Alimony
This court has reviewed all the evidence as it pertains to Sec. 46b-82 C.G.S. In particular, it is acutely aware of the physical and verbal abuse inflicted on plaintiff and her children by defendant starting in 1985, one year after the marriage, and continuing until the date of separation, August 5, 1991, when plaintiff received emergency hospital treatment after having been attacked and choked by defendant. The court is also mindful that defendant used marihuana during the marriage. Lastly, the court is familiar with the present pendente lite court order of October 14, 1992 requiring plaintiff to pay defendant $40 per week in alimony. The court considers the predominating factors in Sec. 46b-82 C.G.S. as applied to the evidence in this matter to be the length of the marriage, the causes for its dissolution, and the award which this court made to defendant CT Page 6610-J pursuant to Sec. 46b-81c C.G.S. While mindful that defendant is clearly not in good health, this court, after reviewing all the evidence, still remains uncertain as to the origin of some of his present physical and emotional problems. It is concluded that any further award of alimony to the defendant would be unmerited and none is made.
VIII. Other Orders
A. Health Insurance
Plaintiff shall maintain defendant on her existing health insurance policy at her own cost and expense until January 1, 1994, at which time it is understood Medicare benefits will become available to defendant.
B. Counsel Fees
In view of the preceding orders of this court, no award of counsel fees is made to either party.
C. Cooperation of the Parties
Each of the parties will execute all documents necessary to carry out the orders of this court.
D. Liabilities
With the exception of the debts due to Blum and Shapiro and to Dr. Rosoff on plaintiff's financial affidavit which are found to be defendant's sole responsibility, each of the parties shall be solely liable for all debts listed on his or her financial affidavit and shall hold the other party harmless in that regard.
E. Change of Name
Plaintiff's prior married name of Deborah King is restored to her.
F. Defendant's Inheritance
Plaintiff shall have no interest in any proceeds from the estate of defendant's uncle, Alexander A. Koziatek, he having died after the commencement of this trial. CT Page 6610-K
Further, plaintiff shall be solely responsible for the payment of the encumbrances at Knollwood, the notes representing these debts having been co-signed by defendant, and shall hold defendant harmless in this regard.
By The Court
John D. Brennan State Trial Referee